UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GREGORY PAPPAS,

                Plaintiff,

-against-

XP INVESTMENTS US, LLC, f/k/a XP SECURITIES LLC and XP CONTROLE PARTICIPACÕES S.A.,

                Defendants.

Case No. 1:19-cv-11137-AJN

**FIRST AMENDED COMPLAINT**

Plaintiff Gregory Pappas ("Pappas"), by his attorneys, Kudman Trachten Aloe LLP, alleges for his first amended complaint against defendants XP Investments US, LLC, formerly known as XP Securities LLC ("XP"), and XP Controle Participacões S.A. ("XPC") as follows:

**PRELIMINARY STATEMENT**

1. This is an action seeking redress for defendants' unlawful termination of Pappas's employment based on his national origin (American) and age (52) in violation of the New York City Human Rights Law ("NYCHRL") as well as XPC's breach of a written agreement concerning XPC shares that Pappas was entitled purchased as part of his employment package.

**THE PARTIES**

2. Pappas is an individual residing in Upper Saddle River, New Jersey.

3. XP is a Delaware limited liability company with its principal place of business located in New York, New York. XP is a FINRA-registered broker-dealer that services retail and institutional clients in equities, fixed income, and derivatives markets globally.

4. XPC is a Brazil-based holding company. XPC controls XP Investimentos CCTVM S.A., which is Brazil's largest investment company and the parent company of XP.

5. XP is solely owned or otherwise controlled, directly or indirectly, by XPC and has at all relevant times been directly or indirectly subject to XPC's operational oversight and control.

1

6. At all times relevant herein, XP determined and controlled Pappas's employment terms, status, responsibilities, and authority.

7. At all relevant times herein, XP had the authority to hire and fire Pappas.

8. At all times relevant herein, XPC determined and controlled Pappas's employment terms, status, responsibilities, and authority.

9. At all relevant times herein, XPC exercised its control of XP to cause the firing of Pappas.

10. At all times relevant herein, XP and XPC conducted themselves in connection with Pappas's employment as his joint employers.

11. At all times relevant herein, XP was an "employer" of Pappas's within the meaning of the NYCHRL.

12. At all times relevant herein, XPC was an "employer" of Pappas's within the meaning of the NYCHRL.

## JURISDICTION AND VENUE

13. This Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(3) because it is between citizens of different states and in which citizens or subjects of a foreign state are additional parties and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

14. XP is subject to the personal jurisdiction of this Court under CPLR 301 because it resides in New York.

15. XPC is subject to the personal jurisdiction of this Court under CPLR 302(a)(1) because it transacted business within the State of New York by entering into a letter agreement with Pappas in New York, and Pappas's breach of contract claim against XPC arises out of that transaction.

16.     XPC is further subject to the personal jurisdiction of this Court under CPLR 302(a)(2) because it committed a tortious act within the State of New York by unlawfully terminating Pappas's employment, and Pappas's claim under the NYCHRL is based on that tortious act.

17.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because the events giving rise to Pappas's claims occurred in this District.

## RELEVANT FACTS

18.     In or around April 2016, Pappas became employed by XP as a "Sales Trader"—i.e., essentially an inter-bank broker of securities.

19.     On information and belief, the decision to hire Pappas was co-determined by XP and XPC.

20.     One of the material considerations that induced Pappas to accept the job was the grant to him by XPC, XP's parent company, of the right "once you become an employee of XP" to purchase $250,000 worth of shares in XPC in accordance a stated formula for determining the price, as reflected in letter agreement between Pappas and XPC dated April 4, 2016 (the "Share Agreement").

21.     XPC unreasonably delayed the purchase date for more than a year after the start of Pappas's employment, during which time the price increased and the number of shares that Pappas was able to purchase decreased.

22.     Pappas nonetheless exercised his right to purchase $250,000 worth of XPC shares.

23.     If the transaction would have occurred timely in accordance with the Share Agreement, Pappas's purchase would have yielded him more shares at a lower purchase price.

24. Pappas also would have received additional dividend payments on his XPC shares during the period of delay as well as larger dividend payments on the greater number of shares he would have owned.

25. The Share Agreement provided that Pappas's purchase of the XPC shares was conditioned on his later execution of call option agreement, which, as stated in the Share Agreement, gave XPC the right to repurchase the shares at a reduced price (based on a formula set out in the Share Agreement) in the event that Pappas would "leave" (i.e., forsake, resign from, or remove himself from) his employment within three (3) years.

26. The Share Agreement expressly does not provide for repurchase of Pappas's XPC shares in the event of his involuntary termination for any reason or at any time.

27. Pappas performed diligently and successfully for nearly two years, until he was involuntarily terminated without prior notice on March 29, 2018.

28. On information and belief, during or shortly after senior management of XPC visited the XP premises in New York where Pappas sat on a trading desk, XPC, exercising practical control over both XP and Pappas's employment status, directed XP to terminate Pappas's employment.

29. The decision to terminate Pappas's employment was co-determined by XP and XPC.

30. At the time of his termination, Pappas was one of only five (5) American nationals on his brokering "desk."

31. The other nine (9) brokers were of Latin American national origin, six (6) being Brazilian.

32. Pappas was also the oldest broker on the desk, with the average age of the other brokers being about 37.

33. Pappas was a productive broker.

34. Pappas's commission compensation in 2017 was about $350,000.

35. Upon terminating Pappas, XP, as a FINRA-registered broker-dealer, had a regulatory obligation to truthfully report its reason for doing so on a FINRA Form U-5.

36. XP filed a Form U-5 with regard to Pappas.

37. XP has on the written record represented why it, along with XPC, terminated Pappas.

38. Under the Form U-5's heading titled "Termination Explanation," XP stated:

*Mr. Pappas was terminated because he was not aligned with the company's <u>culture</u>. Termination was <u>not</u> related to performance or customer related issues.* (emphasis added)

39. As a consequence of XP's regulatory filing, XP is estopped from claiming in any judicial proceeding that its termination of Pappas's employment was related either to performance or customer-related issues.

40. In light of the fact that Pappas was the oldest broker on his desk and that the desk was so heavily weighted in favor of Brazilians and other Latin Americans as compared to American nationals, XP's stated reason for his termination—i.e., cultural non-alignment—is at least suggestive (if not an admission) of age and/or national origin discrimination.

41. Although the explanation XP provided in Pappas's Form U-5 is not very particular, it plainly paints Pappas as "an outsider"—i.e., one who does not "fit in" with the group because he is "not one of us."

42. Cultural difference, in this context, is given to sounding like a code phrase for being in the minority where the majority, whether in terms of national origin (Brazilian or other Latin American nationality) or age (youth), has its "cultural norms."

43. Following Pappas's unlawful termination, XPC forcibly repurchased Pappas's shares of XPC at a price using the formula set forth in the Share Agreement for employees who "leave" within three years of starting employment.

## FIRST CAUSE OF ACTION
### Breach of Contract
### (Against XPC)

44. Pappas repeats and realleges the allegations contained in paragraphs 1 through 43.

45. The Share Agreement is a valid and binding contract.

46. Pappas performed all the material obligations required of him in the Share Agreement.

47. XPC breached the Share Agreement by unreasonably delaying the purchase date by more than a year after the start of Pappas's employment, causing Pappas to suffer damages to the extent that he was deprived of his contractual right to purchase as many shares as he could have had XPC timely performed its obligations and was deprived of his right to receive additional and greater dividend payments on his XPC shares.

48. XPC further breached the Share Agreement, and the covenant of good faith and fair dealing inherent therein, by wrongfully causing the termination of Pappas's employment in order to forcibly repurchase Pappas's XPC shares at a less-than-value price using the formula set forth in the Share Agreement for upon voluntarily leaving XP employment, depriving Pappas of the anticipated fruits of his contract.

49. Pappas has been damaged by XPC's breaches of the Share Agreement in an amount to be determined at trial, but in no event less than $2,500,000.

## SECOND CAUSE OF ACTION
### Violation of NYCHRL – Discriminatory Discharge
### (Against XP and XPC)

50. Pappas repeats and realleges the allegations contained in paragraphs 1 through 43.

51. XP was at the time of Pappas's firing his employer within the meaning of the NYCHRL.

52. XPC was at the time of Pappas's firing his employer within the meaning of the NYCHRL.

53. In firing Pappas, XP and XPC discriminated against him based on his national origin and age in violation of the NYCHRL (N.Y. Admin. Code § 8-107(1)).

54. As a result of the termination of his employment, Pappas has suffered and continues to suffer a loss of wages, salary, employee benefits, and the value of his rights under the Share Agreement to which he would have been entitled if not fired.

55. Pappas has suffered and continues to suffer humiliation and emotional pain and suffering as a result of said unlawful discrimination, which has substantially reduced his opportunities for personal and professional development and advancement.

56. Pappas is entitled to punitive damages because XP and XPC's unlawful discrimination was willful, wanton, reckless, and involved a conscious or reckless disregard of Pappas's protected rights under the NYCHRL.

57. In addition to compensatory and punitive damages, the NYCHRL provides that Pappas may recover his reasonable attorneys' and costs.

## THIRD CAUSE OF ACTION
### Violation of NYCHRL – Aiding and Abetting
### (Against XPC)

58. Pappas repeats and realleges the allegations contained in paragraphs 1 through 43 and 51 through 57.

59. By its encouragement and asserted influence of XP to fire Pappas in violation of the NYCHRL, XPC violated the NYCHRL by aiding and abetting XP's unlawful discriminatory conduct.

60. XPC's aiding and abetting was willful, wanton, reckless, and involved a conscious or reckless disregard of Pappas's protected rights under the NYCHRL.

61. Pappas is entitled to recover from XPC on this cause of action punitive damages as well as economic and compensatory damages for the harm resulting from the termination of his employment, as set forth above.

## **JURY TRIAL DEMAND**

Pappas demands a trial by jury on all issues in this action.

**WHEREFORE**, Pappas demands judgment in his favor as follows:

a) on the First Cause of Action, awarding damages in an amount to be determined at trial, but in no event less than $2,500,000, plus interest thereon;

b) on the Second and Third Causes of Action awarding compensatory and punitive damages in an amount to be determined at trial;

c) awarding reasonable attorneys' fees, interest, costs, and expenses, to the extent provided for in law; and

d) granting such other and further relief as the Court deems just and proper.

Dated: New York, New York
January 23, 2020

By: _____
Gary Trachten
David N. Saponara
KUDMAN TRACHTEN ALOE LLP
Empire State Building
350 Fifth Avenue, 68th Floor
New York, New York 10118
Tel: (212) 868-1010

*Attorneys for Plaintiff Gregory Pappas*